**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**

| IN RE:<br><br>**University Directories, LLC, *et al.*,**<br>**Debtors** | **CASE NUMBER: 14-81184**<br>**JOINTLY ADMINISTERED**<br>**CHAPTER 11** |
|---|---|
| **University Directories, LLC,**<br>**Print Shop Management, LLC,**<br>**VilCom, LLC,**<br>**VilCom Interactive Media, LLC,**<br>**VilCom Properties, LLC, and**<br>**VilCom Real Estate Development (VRD),**<br>**LLC,**<br>**Plaintiffs**<br><br>**vs.**<br><br>**Eli Global, LLC,**<br>**UDX, LLC,**<br>**Southland National Insurance Corporation,**<br>**UD Holdings, LLC,**<br>**SNA Capital, LLC,**<br>**Around Campus, LLC,**<br>**Greg Lindberg, and**<br>**Scott Hall**<br>**Defendants** | **ADVERSARY PROCEEDING**<br>**NO.: 14 - _____** |
| **COMPLAINT** ||

NOW COME the Plaintiffs, by and through counsel and complaining of the Defendants allege the following:

**Jurisdiction, Venue and Parties**

1.      This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.

2.      Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      On October 24, 2014 (the "Petition Date"), University Directories, LLC ("UD"), Print Shop Management, LLC ("Print Shop"), VilCom, LLC ("VilCom"), VilCom Interactive Media, LLC ("VIM"), VilCom Properties, LLC ("VP") and VilCom Real Estate Development

1

(VRD), LLC ("VRD," and collectively, the "Debtors") filed voluntary petitions in the United States Bankruptcy Court for the Middle District of North Carolina, seeking relief under Chapter 11 of the Bankruptcy Code.

4.     Upon information and belief, Eli Global, LLC ("Eli Global") is a North Carolina limited liability company. Eli Global has listed its principal office address with the North Carolina Secretary of State as 2222 Sedwick Road, Durham, NC 27713.

5.     Upon information and belief, UDX, LLC ("UDX") is a North Carolina limited liability company. UDX has listed its principal office address with the North Carolina Secretary of State as 2222 Sedwick Road, Durham, NC 27713.

6.     Upon Information and belief, Southland National Insurance Corporation ("Southland National") is an Alabama corporation. Southland National has listed its principal office address with the Alabama Secretary of State as PO Box 1520, Tuscaloosa, AL 35403.

7.     Upon information and belief, UD Holdings, LLC ("UD Holdings") is a North Carolina limited liability company. UD Holdings has listed its principal office address with the North Carolina Secretary of State as 2222 Sedwick Road, Durham, NC 27713.

8.     Upon information and belief, SNA Capital, LLC ("SNA Capital") is a North Carolina limited liability company. SNA Capital has listed its principal office address with the North Carolina Secretary of State as 2222 Sedwick Road, Durham, NC 27713.

9.     Upon information and belief, Around Campus, LLC ("Around Campus") is a North Carolina limited liability company. Around Campus has listed its principal office address with the North Carolina Secretary of State as 2222 Sedwick Road, Durham, NC 27713.

10.     Upon information and belief, Greg Lindberg ("Lindberg") is an individual residing in North Carolina and has been identified as the Manager, Chairman and CEO of Eli Global.

11.     Upon information and belief, Scott Hall ("Hall") is an individual residing in North Carolina and has been identified as the President of UDX.

12.     Upon information and belief, all the Defendants are subject to service of process pursuant to Rule 7004(b) of the Federal Rules of Bankruptcy Procedure anywhere in the United States.

**Plaintiffs' Business Entities and Operations**

13.     UD is a collegiate marketing and media company doing business as The AroundCampus Group.  The company was established in 1974 when it acquired the rights to publish official student/faculty telephone directories, and now publishes official school directories and/or student planners.

14.     Print Shop operates a retail store at a leased facility in Chapel Hill, NC.

15.     Vilcom provides corporate management, and provides consolidated cash management of and for the business entities.

16.     VIM owns and operates WCHL, a radio station broadcasting from Chapel Hill, NC, and "Chapelboro" which is an on-line news and marketing service.

17.     VP owns 100% of the membership interests in VRD.

18.     VRD owns residential real properties located at (i) 740 Gimghoul Road and 743, 747 and 749 Raleigh Road, Chapel Hill, North Carolina (the "Gimghoul Property") and (ii) 15 Seaside Sparrow Road, Hilton Head, South Carolina (the "Hilton Head Property").

19.     On October 29, 2013, UD filed a federal application to register "AROUNDCAMPUS" (U.S. Ser. No. 86/104,006) as a trademark and service mark, which application is presently pending before the U.S. Patent and Trademark Office and enforceable under the Lanham Act.

20.     UD has common law marks which appear on its website, including "THE AROUNDCAMPUS GROUP" and the AC shield logo design, which are not registered but are enforceable under the Lanham Act or applicable state law.

21.     The Debtors (and UD in particular) have made actual and continuous use of the registered and unregistered trademarks throughout the United States, have not abandoned such trademarks, and have established their exclusive right to use such trademarks within the United States.

**Factual Allegations**

22.     Prior to filing the Chapter 11 petitions, UD retained an investment banker for the purpose of selling the business as a going concern.  After negotiating with a number of potential purchasers, UD narrowed the prospective purchasers to two companies.  Each of the two companies submitted offers to purchase UD.

3

23.     On or about August 22, 2014, UD signed a "Letter Agreement" with Eli Global, executed on its behalf by Lindberg, pursuant to which:

    a.    UD agreed to furnish confidential information (the "Evaluation Material") to Eli Global solely for the purpose of evaluating a potential transaction with UD or its equity holders (a "Transaction").

    b.    Eli Global agreed to treat the Evaluation Material in accordance with the provisions of the Letter Agreement and to take or abstain from taking certain other actions set forth therein.

    c.    Eli Global agreed that the Evaluation Material would be used solely for the purpose of evaluating a possible Transaction between the Company and Eli Global.

    d.    Eli Global agreed that in the event of any breach of the provisions of the Letter Agreement:

        i.    UD, without limiting any other rights and remedies available to it, shall be entitled to equitable relief, including injunction,

        ii.    Eli Global will not oppose the granting of any such equitable relief, and

        iii.    Eli Global will pay all costs of UD in enforcing its rights, should Eli Global violate the provisions of the Letter Agreement.

24.     In reliance upon the terms and conditions of the Letter Agreement, UD provided Evaluation Material to Eli Global, and Eli Global conducted its due diligence.

25.     Eli Global and UD executed a Term Sheet dated September 10, 2014, which was signed by Lindberg on behalf of Eli Global.

    a.    Paragraph 1 of the Term Sheet indicated that Eli Global, through a new company, would acquire ownership of 100% of UD, free and clear of any bank debt, for a purchase price of $1,750,000.  Closing on the transaction was expected to occur on or before October 1, 2014, subject to completion of due diligence and final documentation.

    b.    Paragraph 2 of the Term Sheet provided that "[u]pon acceptance of these terms by Buyer and Seller, Buyer will submit a $200,000 non-refundable earnest money deposit to Buyer's attorney" (the "Non-Refundable Deposit").

4

  c.  Paragraph 3 of the Term Sheet further provided, among other things that "Seller agrees not to discuss or receive offers from other prospective buyers and will not engage in any negotiations with any other party interested in purchasing this company."

  26.  UD kept its existing lender, Harrington Bank, advised of the on-going efforts to sell UD. Harrington Bank was acquired by Bank of North Carolina ("BNC") through Articles of Merger effective as of June 1, 2014, but continued to operate under the name of Harrington Bank in Chapel Hill, NC.

  27.  James Heavner ("Heavner"), the CEO of UD, had worked with Larry Loeser ("Loeser"), the President and CEO of Harrington Bank, for over a decade. Loeser provided business and financial advice to Heavner and the Plaintiffs, and Heavner and Plaintiffs placed a special trust and confidence in Loeser and Harrington Bank/BNC.

  28.  In September of 2014, UD informed Loeser and Harrington Bank/BNC that it had entered into the Letter Agreement and Term Sheet with Eli Global.

  29.  On September 15, 2014, Eli Global, Lindberg or other Defendants formed or caused to be formed Around Campus, LLC, a North Carolina limited liability company without notice to or permission from UD.

  30.  On or about September 19, 2014, Chip Crawford ("Crawford"), the CFO of UD, arranged a meeting between Loeser and Lindberg so that the parties could discuss options with respect to the satisfaction of UD's loans with Harrington Bank at the closing of any Transaction between UD and Eli Global.

  31.  On September 19, 2014, Eli Global, Lindberg or other Defendants formed or caused to be formed UD Holdings, LLC, a North Carolina limited liability company.

  32.  On September 19, 2014, Eli Global, Lindberg or other Defendants formed or caused to be formed UDX, LLC, a North Carolina limited liability company.

  33.  On or about September 22, 2014, Eli Global executed a Confidentiality Agreement with BNC, pursuant to which:

  a.  BNC agreed to provide confidential information regarding certain loans (the "Loans") to Eli Global for purposes of evaluating a possible sale of the debt to Eli Global.

b.      Eli Global agreed to use such confidential information solely for the purpose of evaluating the potential purchase of the Loans and for no other purpose.

c.      Eli Global agreed that the Confidentiality Agreement shall apply to and be binding on Eli Global and its directors, officers, employees, agents, attorneys, successors and assigns.

34.     The Loans referenced in the Confidentiality Agreement consisted of (i) four loans made by Harrington Bank/BNC to UD (the "UD Loans"), secured by a blanket lien on the assets of UD, certain assets pledged by other Debtors, and a junior mortgage on the Hilton Head Property and the Gimghoul Property, and (ii) one loan made by Harrington Bank/BNC to VRD (the "VRD Loan"), secured by a senior mortgage on the Gimghoul Property.

35.     During the week prior to September 30, 2014, Eli Global advised and represented to UD that it needed to delay the closing for an additional month in order to assemble the information necessary for closing, including information needed from certain banks.

36.     Eli Global and UD executed a Revised Term Sheet dated September 30, 2014, which again was signed by Lindberg on behalf of Eli Global.  Pursuant to the Revised Term Sheet, the closing date was delayed until October 31, 2014 but all other terms and conditions were substantially the same.

37.     On September 30, 2014, Loeser retired from Harrington Bank/BNC and Danny Broach ("Broach"), a vice president with BNC, continued discussions with Eli Global and Lindberg regarding the Transaction and the UD Loans.  Neither Heavner nor the Plaintiffs had any previous relationship with Broach.

38.     Although neither Harrington Bank nor BNC had provided any notice of default to UD or the other Debtors with respect to the UD Loans, BNC notified UD on October 10, 2014, that BNC had sold the UD Loans to UDX.

39.     Although neither Harrington Bank nor BNC had provided any notice of default to UD or the other Debtors with respect to the VRD Loan, BNC notified UD on October 10, 2014, that BNC had sold the VRD Loan to Southland National. Southland National is listed on the website for Eli Global as one of its "Portfolio Companies."

40.     On October 13, 2014, in an afternoon phone call by and among Lindberg, Hall, Crawford, and Heavner, Crawford and Heavner expressed alarm at the unexpected acquisition of the UD Loans and VRD Loan by UDX and Southland National, and expressed great concern

6

about the company's vulnerability. During the phone call, Lindberg repeatedly represented to Crawford and Heavner that he (Lindberg) was doing this for the benefit of all and that he would show UD on Wednesday how this would help everyone.

41.     At a meeting early in the day on October 15, 2014, a Membership Interest Purchase Agreement was presented by Lindberg to UD, in which UD Holdings was identified as the "Buyer" and Lindberg was identified as the Manager of UD Holdings. The draft agreement proposed a transaction where 100% of the Membership Interests in UD would be transferred to UD Holdings for the sum of $1.00. This offer did not conform to the Term Sheet and was verbally rejected by Plaintiffs.

42.     At the same meeting on October 15, 2014, a Membership Interest Purchase Agreement was presented to VP, in which SNA Capital[1] was identified as the "Buyer" and Lindberg was identified as the Manager of SNA Capital. The draft agreement proposed a transaction where 100% of the Membership Interests in VP would be transferred to SNA Capital, LLC for the sum of $500,504.00 payable in monthly installments; provided however, that the Buyer could instead remit all or any portion of such monthly installments in satisfaction of any overdue amounts payable to Southland National as the holder of the VRD Loan. This offer to purchase the ownership interests in VP was not addressed in any way by the Term Sheet and was verbally rejected by Plaintiffs.

43.     Immediately following Plaintiffs' verbal rejection on October 15, 2014 of the new offers set forth in the two draft Membership Interest Purchase Agreements, and despite the verbal assurances and representations made by Lindberg during the telephone call on October 13, 2014, UDX took the following actions with respect to the Loans acquired from BNC:

a.     By Notice dated October 15, 2014, UDX gave notice of default and acceleration of the indebtedness evidenced by the UD loans.

b.     By Notice dated October 15, 2014, UDX gave notice to UD, Print Shop, VilCom, VIM, and VP of the intended disposition of the collateral securing the UD Loans by private sale sometime after October 25, 2014.

c.     By Notice dated October 16, 2014, UDX gave a second notice of default under the UD Loans, attached copies of certain balance sheets and income statements

---

[1] On May 12, 2014, Eli Global, Lindberg or other Defendants had formed or caused to be formed SNA Capital, LLC, a North Carolina limited liability company.

which were furnished by UD to Eli Global pursuant to the Letter Agreement, and demanded that:

      i.      Heavner provide an accounting of all of his personal assets with a value of at least $10,000,

      ii.     UD, Print Shop, VilCom, VIM, and VP provide certain financial information and documents, and

      iii.    UD, Print Shop, VilCom, VIM, and VP deliver all stock certificates, certificates of title and certain other documents.

d.     By Notice dated October 20, 2014, UDX gave a third notice of default under the UD Loans and demanded that the collateral securing the UD Loans be marshalled and delivered to Scott Hall.

44.     On October 20, 2014, VRD sent by overnight courier to Southland National a cashier's check in the amount of $42,360.78, representing payment of the monthly installments due for September 17, and October 17, 2014.

45.     Upon receipt of the tendered payment, Southland National assigned the VRD Loan to UDX, and UDX then took the following additional actions with respect to the Loans acquired from BNC:

a.     By Notice dated October 21, 2014, UDX gave notice that Southland National had assigned the VRD Loan to UDX.

b.     By Notice dated October 21, 2014, UDX gave notice of default and acceleration of the indebtedness evidenced by the VRD Loan.

c.     On or about October 21, 2014, Scott Hall advised the closing attorney for the Hilton Head Property that the payment required to release the mortgage securing the UD Loans was $1,000,000, notwithstanding that the release provisions contained in the Loan Modification Agreement dated March 12, 2014 between UD, Heavner, Vilcom, VIM, VP and Harrington Bank required a release payment in a substantially smaller amount.

d.     On October 22, 2014, UDX commenced a civil action in state court against UD, VilCom, VIM, VP, VRD and Heavner seeking, among other relief:

      i.      Immediate possession of the collateral securing the UD Loans and the VRD Loan.

8

      ii.      Appointment of a receiver.

      iii.     A temporary restraining order, a preliminary injunction, and a permanent injunction.

      iv.     Damages in excess of $2,000,000 in satisfaction of the indebtedness under the UD Loans.

      v.     Damages in excess of $3,380,000 in satisfaction of the indebtedness under the VRD Loan.

      vi.     Attorney fees and costs.

46. Hall executed all notices and documents referenced in Paragraph 38 above on behalf of UDX.

47. Upon information and belief, (i) UDX purchased the UD Loans from BNC for less than the outstanding indebtedness, and (ii) Southland National purchased the VRD Loan from BNC for less than the outstanding indebtedness.

48. On October 23, 2014, UDX notified UD and VRD that the amounts necessary to satisfy the UD Loans and the VRD Loans as of that date was, in the aggregate, $5,527,092.89, consisting of the full amount of the outstanding indebtedness plus additional amounts for attorneys' fees, other fees and costs.

49. In order to protect the assets securing the UD Loans and the VRD Loan, and to protect the business operations and preserve the going concern value thereof, the Debtors were forced to file emergency petitions seeking relief pursuant to Chapter 11 of Title 11 of the U.S. Code on October 24, 2014.

50. As a direct result of filing the Chapter 11 proceedings, Plaintiffs will incur substantial attorneys' fees, administrative expenses and other costs, and Plaintiffs' assets may suffer significant loss or diminution in value.

**Misconduct By Defendants**

51. Pursuant to the Letter Agreement and in direct reliance thereon, UD furnished Evaluation Material to Eli Global solely for the purpose of evaluating a potential transaction with UD or its equity holders.

52. Eli Global agreed to treat the Evaluation Material in accordance with the provisions of the Letter Agreement and to take or abstain from taking certain other actions set forth therein.

9

53.     Eli Global agreed that the Evaluation Material would be used solely for the purpose of evaluating a possible Transaction between UD and Eli Global.

54.     Plaintiffs informed Harrington Bank/BNC of the Transaction between UD and Eli Global.   In communicating the details of the Transaction to Harrington Bank/BNC, Plaintiffs placed a special confidence and trust in Harrington Bank/BNC who, as the holder of the Loans, was in a dominate position in relation to Plaintiffs.

55.     Pursuant to the Confidentiality Agreement, BNC agreed to provide confidential information regarding the Loans to Eli Global for purposes of evaluating a possible sale of the Loans.  Plaintiffs, BNC and Eli Global expected and understood that any negotiated sale of the Loans to Eli Global was to occur, if at all, coterminous with the closing of the sale of UD to Eli Global.

56.     BNC had a duty to maintain the confidentiality of Plaintiffs' financial information, and Plaintiffs were intended third-party beneficiaries of the Confidentiality Agreement.

57.     Pursuant to the terms and conditions of the Letter Agreement and/or the Confidentiality Agreement, Eli Global received confidential information subject to express terms and conditions which imposed certain obligations upon Eli Global to use such confidential information only for the permitted purposes and no other.

58.     Eli Global used the Evaluation Material to obtain confidential information from BNC regarding the Loans, and used the Confidentiality Agreement to acquire, through its affiliates UDX and Southland National, the Loans from BNC, all in bad faith and for the purpose of exerting undue pressure upon Plaintiffs to sell UD for less than fair value.

59.     At all times after acquiring the Loans from BNC, Eli Global, UDX and Southland National owed a fiduciary duty to the Plaintiffs given the special circumstances and agreements governing the relationship between the parties.  The relationship was not merely that of creditor-debtor, but was a relationship in which Eli Global owed a duty of confidentiality and a duty of good faith and fair dealing to the Plaintiffs as a result of the Letter Agreement and/or Confidentiality Agreement.

60.     In contravention of these duties, immediately after acquiring the Loans, UDX and Southland National declared the existence of defaults and accelerated the indebtedness under the Loans, and UDX attempted to obtain possession and ownership of collateral securing the Loans

10

for less than fair value, all in bad faith and for the purpose of exerting undue pressure upon Plaintiffs to sell UD for less than fair value.

61.     Defendants had knowledge of the violation of Eli Global, UDX and/or Southland National's contractual and fiduciary duties to Plaintiffs and provided substantial assistance in achieving such violation.  Defendants aided and abetted Eli Global, UDX and/or Southland National in the breach of their fiduciary duties to Plaintiffs.

62.     Under North Carolina law, there is also an implied covenant of good faith and fair dealing in every contract which requires that (i) a party to the contract has the duty to do everything that the contract presupposes will be done to accomplish its purpose, and (ii) neither party will do anything which injures the rights of the other to receive the benefits of the agreement.

63.     Pursuant to the Letter Agreement, the Confidentiality Agreement, and the Term Sheet including revisions thereto, Eli Global impliedly covenanted that it would deal with UD fairly and in good faith.  The duty of good faith and fair dealing required Eli Global to act in good faith.

64.     Eli Global violated the implied covenant of good faith and fair dealing when it used confidential information to acquire, through UDX and Southland National, the UD Loans and the VRD Loan for the ulterior purposes set forth above.

65.     UDX, Southland National and the other Defendants agreed and conspired with Eli Global to acquire the Loans for the improper and unlawful purposes set forth above.  Each Defendant also took actions in furtherance of the agreement.  As a proximate result of the acts committed by Defendants in furtherance of the aims of the agreement, Plaintiffs suffered actual injury.

66.     Eli Global failed or refused to make the Non-Refundable Deposit of $200,000 required under the terms of the Term Sheet and the revised Term Sheet.

67.     Around Campus, LLC was created by or at the direction of Eli Global or other Defendants without the consent or agreement of Plaintiffs, and infringes on Plaintiffs' trademarks and violates applicable federal and state law.

68.     Eli Global and the other Defendants willfully acted in concert, conspired and colluded to acquire the UD Loans and the VRD Loan for the sole purpose of exercising undue pressure on the Debtors and Mr. Heavner, so as to acquire the UD assets for less than fair value.

69.     Eli Global and the other Defendants engaged in unfair and deceptive acts or practices in or affecting commerce.

**Count I: Breach of Fiduciary Duty**

70.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 69 above in their entirety.

71.     At all times after the purchase of the Loans by UDX and Southland National, Eli Global, UDX and/or Southland National owed a fiduciary duty to the Plaintiffs.

72.     Eli Global, UDX and/or Southland National violated their fiduciary duty to Plaintiffs when they used the Evaluation Material to acquire the UD Loans and VRD Loan in bad faith and for the purpose of exerting undue pressure upon Plaintiffs to sell UD for less than fair value.

73.     Eli Global, UDX and/or Southland National breached their fiduciary duty to Plaintiffs when they declared the existence of defaults and accelerated the indebtedness under the Loans, and attempted to obtain possession and ownership of collateral securing the Loans for less than fair value, all in bad faith and for the purpose of exerting undue pressure upon Plaintiffs to sell UD for less than fair value.

74.     Defendants aided and abetted Eli Global, UDX and/or Southland National in the breach of their fiduciary duties to UD.

75.     As a direct and proximate result of the conduct of Defendants, UD and the other Plaintiffs have suffered damages in an amount to be proven at trial.  Such damages include, without limitation, (i) the amount of their attorneys' fees, administrative expenses and other costs incurred in the Chapter 11 proceedings, and (ii) the amount of any loss or diminution in value of Plaintiffs' assets suffered as a result thereof.

**Count II: Breach of Contract-Injunctive Relief**

76.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 75 above in their entirety.

77.     By reason of the breach of the Letter Agreement and the Confidentiality Agreement by Eli Global and the acts by other Defendants to aid and abet the breach as set forth above, Plaintiffs are entitled to injunctive relief to remedy such wrongful conduct.

78.     Eli Global agreed that in the event of any breach of the provisions of the Letter Agreement, (i) UD, without limiting any other rights and remedies available to it, shall be

12

entitled to equitable relief, including injunction, and (ii) Eli Global will not oppose the granting of any such equitable relief.

79.     Appropriate equitable relief would consist, among other things, in allowing the Debtors to satisfy the UD Loans and the VRD Loan by payment of the aggregate amount paid by any of the Defendants to BNC to acquire the Loans, less (i) credit for any amounts received by any of the Defendants on account of such Loans, and (ii) set off of any damages, fees or costs awarded to Plaintiffs against UDX or the other Defendants in this proceeding.

**Count III: Breach of Contract-Damages**

80.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 79 above in their entirety.

81.     By reason of the breach of the Letter Agreement, Term Sheet and/or the Confidentiality Agreement by Eli Global and the acts by all Defendants in conspiring with Eli Global to engage in such unlawful conduct as set forth above, Plaintiffs are entitled to the recovery of actual damages from the Defendants suffered as a direct result thereof.

82.     Plaintiffs are entitled to entry of a judgment in the aggregate amount of (i) the Non-Refundable Deposit of $200,000, (ii) the amount of their attorneys' fees, administrative expenses and other costs incurred in the Chapter 11 proceedings, and (iii) the amount of any loss or diminution in value of Plaintiffs' assets suffered as a result thereof.

**Count IV: Breach of Implied Covenants of Good Faith and Fair Dealing-Damages**

83.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 82 above in their entirety.

84.     As set forth above, Eli Global breached its duty of good faith and fair dealing under the Letter Agreement, Confidentiality Agreement and Term Sheet, and such breach was aided and abetted by the other Defendants.

85.     As a direct and proximate result of the breach of the implied covenant of good faith and fair dealing by Eli Global, Plaintiffs suffered actual damages.

86.     By reason of the breach of the implied covenant of good faith and fair dealing by Eli Global and the acts by the other Defendants to aid and abet the breach as set forth above, Plaintiffs are entitled to recover compensatory damages from the other Defendants for an amount to be proven at trial, plus interest, costs and attorneys' fees, including but not limited to all

attorneys' fees and costs in the Chapter 11 proceedings and any diminution in value of Plaintiffs' assets.

## Count V: Unfair and Deceptive Trade Practices-Treble Damages and Attorneys' Fees

87.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 86 above in their entirety.

88.     As set forth above, the misconduct of Eli Global and the other Defendants was deceptive, immoral, unethical, oppressive, or unscrupulous, in violation of  N.C. Gen. Stat. § 75-1.1, *et seq*.

89.     The unfair and deceptive conduct detailed throughout this pleading constitutes substantial aggravating circumstances attendant to breach of other legal obligations.

90.     As set forth above, the wrongful acts committed by Eli Global and the other Defendants will cause Plaintiffs actual loss or damage in the form of substantial attorneys' fees and costs in the Chapter 11 proceedings and possible loss or diminution in value of Plaintiffs' assets.

91.     Plaintiffs are entitled to recover their actual damages, trebled pursuant to N. C. Gen. Stat. § 75-16, from the Defendants.

92.     Plaintiffs are entitled to recover their reasonable attorneys' fees pursuant to N. C. Gen. Stat. § 75-16.1 from the Defendants.

## Count VI: Trademark Infringement-Injunctive Relief and Damages

93.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 92 above in their entirety.

94.     For the reasons set forth above, Plaintiffs are entitled to preliminary and permanent injunctive relief directing the Defendants to (i) dissolve Around Campus, LLC, and (ii) cease and desist from making any further use of Plaintiffs' trademarks including but not limited to "Around Campus" or any derivation thereof.

95.     Plaintiffs are entitled to recover from the Defendants any damages suffered, together with their reasonable attorneys' fees and costs incurred in addressing the infringement of Plaintiffs' trademarks.

## Count VII: Equitable Subordination

96.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 95 above in their entirety.

97. Eli Global and the other Defendants, acting in concert and in breach of fiduciary duties to Plaintiffs while negotiating to buy UD or its business, secretly purchased the UD Loans and the VRD Loan at a discount.

98. Eli Global and the other Defendants purchased the UD Loans and the VRD Loan at a discount for the purpose of obtaining undue advantage over Plaintiffs and the unsecured creditors of Plaintiffs, prior to the commencement of these Chapter 11 proceedings.

99. By purchasing the UD Loans and the VRD Loan at a discount, without notice to Plaintiffs of its intent to do so in advance of a purchase of the UD business, Eli Global and the other Defendants thereby usurped the corporate opportunity of Plaintiffs to satisfy the UD Loans and the VRD Loan at a discount.

100. Eli Global and the other Defendants purchased the UD Loans and the VRD Loan at a discount and then attempted to enforce lender remedies for the purposes of exerting control over Plaintiffs and obtaining ownership of Plaintiffs' assets at less than fair value.

101. By purchasing the UD Loans and the VRD Loan at a discount and then attempting to enforce lender remedies for the purpose of exerting control over Plaintiffs and to obtain ownership of Plaintiffs' assets, Eli Global and the other Defendants subverted Plaintiffs' efforts to market and sell UD as a going concern and for fair value.

102. Eli Global and the other Defendants engaged in inequitable, oppressive, and unlawful conduct which caused injury to Plaintiffs and other creditors of the Debtors.

103. Invocation of equitable subordination as set forth above is not inconsistent with the provisions of the Bankruptcy Code, as no creditor should be entitled to profit from its oppressive and unlawful conduct.

104. Pursuant to 11 U.S.C. § 510(c), this Court should reduce or subordinate the secured claim of Eli Global, UDX or other Defendants based upon the Loans acquired from BNC, so as to limit any recovery by the Defendants upon such claims and liens to the amount paid to BNC to acquire the Loans, less (i) credit for any amounts received by any of the Defendants on account of such Loans, and (ii) set off of any damages, fees or costs awarded to Plaintiffs against the Defendants in this proceeding.

**Count VIII: Avoidance of Gimghoul Lien**

105. Plaintiffs incorporate the allegations set forth in paragraphs 1 through 104 above in their entirety.

15

106.    On or about May 23, 2014, VRD executed a Deed of Trust Securing Future Advances (the "Gimghoul Deed of Trust") granting Harrington Bank a third priority lien against the Gimghoul Property in the maximum amount of $1,000,000 (the "Gimghoul Lien").  The Gimghoul Deed of Trust was recorded in the Orange County Register of Deeds on June 6, 2014.

107.    The Gimghoul Lien secured certain indebtedness of UD to Harrington Bank as more specifically set forth in the Gimghoul Deed of Trust.

108.    Upon information and belief, at the time of the execution of the Gimghoul Deed of Trust (hereinafter the "VRD Transfer Date"), VRD was insolvent, in that the liabilities of VRD exceeded the fair market value of the assets of VRD.

a.    The only asset owned by VRD on the VRD Transfer Date was the Gimghoul Property which had a fair market value of approximately $4,875,000.

b.    The debts of VRD as of the VRD Transfer Date included (without limitation):

i.    Approximately $3,300,000 owed to Harrington Bank secured by a first priority lien on the Gimghoul Property; and,

ii.    Approximately $2,645,000 owed to VP.

109.    As of the VRD Transfer Date, VRD was undercapitalized and had incurred debts that it was unable to pay as such debts matured.  VRD had no liquid assets as of the VRD Transfer Date, and its only source of revenue was a small amount of rental income received from a third party who rented the cottage on the Gimghoul Property.

110.    VRD received no direct consideration or value in exchange for the transfer of the Gimghoul Lien to Harrington Bank, in that all of the loan proceeds were paid by Harrington Bank directly to UD.  In addition, the loan proceeds were paid by Harrington Bank to UD several years prior to the VRD Transfer Date.

111.    On October 10, 2014, UDX purchased the UD Loans from BNC, the successor by merger to Harrington Bank.  The UD Loans included the Gimghoul Deed of Trust.

112.    The transfer of the Gimghoul Lien to Harrington Bank (the "VRD Transfer") constituted a transfer of an interest of VRD in property.

113.    The VRD Transfer was made within two (2) years prior to the Petition Date.

114.    VRD received less than a reasonably equivalent value in exchange for the VRD Transfer, and

a. Was insolvent on the date that the VRD Transfer was made, or became insolvent as a result of the VRD Transfer;

b. Was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with VRD was an unreasonably small capital; and/or

c. Intended to incur, or believed it would incur, debts that would be beyond VRD's ability to pay as such debts matured.

115. Pursuant to 11 U.S.C. § 548, the VRD Transfer is avoidable.

116. Pursuant to 11 U.S.C. § 551, the VRD Transfer should be preserved for the benefit of VRD's estate.

**Count IX: Avoidance of Guaranty Obligations**

117. Plaintiffs incorporate the allegations set forth in paragraphs 1 through 116 above in their entirety.

118. On or about May 23, 2014, VP, VIM, and Vilcom (collectively, the "Guarantors") each executed a Commercial Guaranty (collectively, the "Guaranties") in favor of Harrington Bank wherein Guarantors guaranteed payment of the indebtedness of UD to Harrington Bank as more specifically set forth in the Guaranties.

119. Upon information and belief, at the time of the execution of the Guaranties (hereinafter the "Transfer Date"), each Guarantor was insolvent, in that the liabilities of the Guarantor exceeded the fair market value of the assets owned by the Guarantor.

a. <u>VP</u>:  The assets of VP as of the Transfer Date included its 100% membership interest in VRD ("VRD Interest") with a fair market value of $0; the leasehold interest in the real property and tower on Jones Ferry Road ("Tower Lease") with a book value of approximately $290,000; a note payable from VRD in the amount of approximately $2,645,000; and a note payable from Vilcom McClamroch Property, LLC ("McClamroch") in the amount of approximately $705,000.  The Debtor believes that less than 50% of the notes payable from VRD and McClamroch were collectible as of the Transfer Date.  The liabilities of VRD as of the Transfer Date included (without limitation) a note payable to Vilcom in the amount of approximately $3,350,000.

17

b. <u>VIM</u>: The assets of VIM as of the Transfer Date had a book value of less than $700,000 and included the assets on Schedule B to the Petition. The liabilities of VIM as of the Transfer Date were approximately $2,000,000 as set forth on Schedules D, E and F to the Petition.

c. <u>Vilcom</u>: The assets of Vilcom as of the Transfer Date had a book value of approximately $4,500,000 and included (i) the assets on Schedule B to the Petition, (ii) an airplane that was sold before the Petition Date for $365,000, (iii) a note payable from VP in the amount of approximately $3,350,000; and a note payable from Print Shop in the amount of approximately $150,000. The Debtor believes that less than 50% of the notes payable from VP and Print Shop were collectible as of the Transfer Date. The liabilities of Vilcom as of the Transfer Date were approximately $6,000,000, including (without limitation) the liabilities set forth on Schedules D, E and F to the Petition and a note payable to UD in the amount of approximately $5,800,000.

120. As of the Transfer Date, each Guarantor was undercapitalized and had incurred debts that it was unable to pay as such debts matured.

121. None of the Guarantors received consideration or value in exchange for their execution of the Guaranties, in that all of the loan proceeds were paid by Harrington Bank directly to UD. In addition, the loan proceeds were paid by Harrington Bank to UD several years prior to the Transfer Date.

122. On October 10, 2014, UDX purchased the UD Loans from BNC, the successor by merger to Harrington Bank. The UD Loans included the Guaranties.

123. Any obligations incurred by the Guarantors to Harrington Bank pursuant to the Guaranties ("Obligations") are avoidable pursuant to 11 U.S.C. §548 to the extent that:

a. The Obligations were incurred within two (2) years prior to the Petition Date; and,

b. The Guarantors received less than a reasonably equivalent value in exchange for the Obligations, and

i. Were insolvent on the date that the Obligations were incurred, or became insolvent as a result of incurring the Obligations;

18

ii.      Were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Guarantors was an unreasonably small capital; or

iii.     Intended to incur, or believed they would incur, debts that would be beyond the Guarantors' ability to pay as such debts matured.

124.    The Guaranties were entered into on May 23, 2014, and thus, any Obligations created pursuant thereto were incurred within two (2) years prior to the Petition Date.

125.    The Guarantors received less than reasonably equivalent value in exchange for the Obligations, in that no monetary consideration or value was received by the Guarantors in exchange for guaranteeing the Obligations.

126.    On the date that the Obligations were incurred, the Guarantors were insolvent or became insolvent as a result of incurring the Obligations, were undercapitalized, and had incurred debts that the Guarantors were unable to pay as such debts matured.

127.    Pursuant to 11 U.S.C. §548, any Obligations incurred by the Guarantors as a result of the Guaranties are avoidable.

**Count X: Avoidance of Guaranty Obligations**

128.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 127 above in their entirety.

129.    Plaintiffs are not in possession of any commercial guaranties executed by the Guarantors prior to the Guaranties referred to above, and demand proof of the execution same.

130.    In the event it is established that additional guaranties were executed (the "Original Guaranties"), any obligations incurred by the Guarantors to Harrington Bank pursuant to the Original Guaranties (the "Original Obligations") would be avoidable pursuant to 11 U.S.C. § 548, 11 U.S.C. §544 and/or N.C. Gen. Stat. § 39-23.1, *et seq.* to the extent that:

a.    The Original Obligations were incurred within four (4) years prior to the Petition Date; and,

b.    The Guarantors received less than a reasonably equivalent value in exchange for the Original Obligations, and

i.     Were insolvent on the date that the Original Obligations were incurred, or became insolvent as a result of incurring the Original Obligations;

19

   ii.  Were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Guarantors was an unreasonably small capital; or

   iii.  Intended to incur, or believed they would incur, debts that would be beyond the Guarantors' ability to pay as such debts matured.

131. In the event the Guarantors executed Original Guaranties, such guaranties would have been executed before May 23, 2014, but within four (4) years prior to the Petition Date.

132. Upon information and belief, at the time and after the Guarantors incurred any Original Obligations, the Guarantors were or became indebted to one or more creditors holding an unsecured claim that is allowable under Bankruptcy Code § 502.

133. Upon information and belief, the Guarantors would have received less than reasonably equivalent value in exchange for the Original Obligations, in that no monetary consideration or value was received by the Guarantors in exchange for guaranteeing the Original Obligations.

134. Upon information and belief, on the date that any such Original Obligations were incurred, the Guarantors were insolvent or became insolvent as a result of incurring the Original Obligations, were undercapitalized, and had incurred debts that the Guarantors were unable to pay as such debts matured.

135. Upon information and belief, if and when any Original Obligations were incurred by the Guarantors, they were fraudulent as to the Guarantors' then existing and future creditors under §544 of the Bankruptcy Code and N.C.G.S. §§ 39-23.4 and 39-23.5.

136. Pursuant to §544 of the Bankruptcy Code and N.C.G.S. § 39-23.7, any Obligations incurred by the Guarantors as a result of the Original Guaranties are avoidable.

**Count XI: Determination of Extent and Validity of VIM Security Interest**

137. Plaintiffs incorporate the allegations set forth in paragraphs 1 through 136 above in their entirety.

138. On or about December 20, 2010, a UCC-1 Financing Statement from VIM (the "Financing Statement") was recorded with the North Carolina Secretary of State purporting to grant to Harrington Bank a perfected security interest in certain property owned by VIM as more specifically set forth in the Financing Statement.

139.     Plaintiffs are not in possession of any security agreement or other document executed by VIM granting Harrington Bank a security interest in the personal property described in the Financing Statement of VIM.

140.     Demand is made that UDX, as the assignee of the Financing Statement from Harrington Bank, establish the extent and validity of its security interest in the assets of VIM.

141.     If it is determined that UDX does not have a valid security interest in the assets of VIM, then this Court should require UDX to terminate the Financing Statement by filing a notice of termination with the North Carolina Secretary of State.

## Count XII: Alternative Claim for Avoidance VIM Security Interest

142.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 141 above in their entirety.

143.     In the event it is established that a security agreement was executed by VIM in favor of UDX, as successor in interest to Harrington Bank (the "Security Agreement"), the transfer of the perfected security interest pursuant to the Security Agreement and Financing Statement (the "VIM Transfer") constituted a transfer of an interest of VIM in property.

144.     The VIM Transfer is avoidable pursuant to 11 U.S.C. § 548, 11 U.S.C. §544 and/or N.C. Gen. Stat. § 39-23.1, *et seq.* to the extent that:

a.     The VIM Transfer was made within four (4) years prior to the Petition Date; and,

b.     VIM received less than a reasonably equivalent value in exchange for the VIM Transfer, and

    i.     Was insolvent on the date that the VIM Transfer was made, or became insolvent as a result of the VIM Transfer;

    ii.     Was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with VIM was an unreasonably small capital; or

    iii.     Intended to incur, or believed it would incur, debts that would be beyond VIM's ability to pay as such debts matured; and/or

c.     When the VIM Transfer was made, it was fraudulent as to VIM's then existing and future creditors under §544 of the Bankruptcy Code and N.C.G.S. §§ 39-23.4 and 39-23.5.

145.     In the event this Court avoids the VIM Transfer pursuant to 11 U.S.C. § 548, 11 U.S.C. §544 and/or N.C. Gen. Stat. § 39-23.1, *et seq.*, then the VIM Transfer should be preserved for the benefit of VIM's estate pursuant to 11 U.S.C. § 551.

Wherefore, the Plaintiffs pray for the Court to grant the following relief:

1.     Judgment against Eli Global and other Defendants, jointly and severally, for damages arising from breach of contract in an aggregate amount equal to (i) the amount of the Non-Refundable Deposit of $200,000, (ii) the amount of Plaintiffs' attorneys' fees, administrative expenses and other costs incurred in the Chapter 11 proceedings, and (iii) the amount of any loss or diminution in value of Plaintiffs' assets suffered as a result thereof.

2.     Judgment against Eli Global and other Defendants, jointly and severally, for compensatory damages arising from breach of implied covenants of good faith and fair dealing in an amount to be proven at trial, plus interest, costs and attorneys' fees, including but not limited to all attorneys' fees and costs in the Chapter 11 proceedings and any loss or diminution in value of Plaintiffs' assets.

3.     Judgment against Eli Global and other Defendants, jointly and severally, for damages arising from breach of fiduciary duty in an aggregate amount equal to Plaintiffs' actual damages, including but not limited to Plaintiffs' attorneys' fees and costs incurred in the Chapter 11 proceedings.

4.     Judgment against Eli Global and other Defendants, jointly and severally, for damages arising from unfair and deceptive trade practices in an aggregate amount equal to Plaintiffs' actual damages, including but not limited to Plaintiffs' attorneys' fees and costs incurred in the Chapter 11 proceedings, trebled pursuant to N. C. Gen. Stat. § 75-16, and Plaintiffs' reasonable attorneys' fees and costs incurred in this adversary proceeding, pursuant to N. C. Gen. Stat. § 75-16.1.

5.     Preliminary and permanent injunctive relief, directing the Defendants to (i) dissolve Around Campus, LLC, and (ii) cease and desist from making any further use Plaintiffs' trademarks, including but not limited to "Around Campus" or any derivation thereof, within the United States.

6.     Judgment against Eli Global and other Defendants, jointly and severally, for damages arising from the infringement of Plaintiffs' trademarks, together with Plaintiffs' reasonable attorneys' fees and costs incurred in enforcing Plaintiffs' trademarks.

7.        Entry of an Order providing that the UD Loans and the VRD Loan may be satisfied in full, and reducing or subordinating the claims asserted by UDX and other Defendants so as to limit any recovery upon such claims and liens to the aggregate amount paid to BNC to acquire the Loans, <u>less</u> (i) credit for any amounts received by any of the Defendants on account of such Loans, and (ii) set off of any damages, fees or costs awarded to Plaintiffs against Defendants in this proceeding.

8.        To avoid and set aside the VRD Transfer to UDX, as successor in interest to Harrington Bank, pursuant to 11 U.S.C. § 548, and preserve the VRD Transfer for the benefit of VRD's estate pursuant to 11 U.S.C. § 541.

9.        To avoid and set aside any Obligations incurred by the Guarantors as a result of the Guaranties pursuant to 11 U.S.C. § 548.

10.        To the extent any Original Guaranties exist, to avoid and set aside any Original Obligations incurred by the Guarantors as a result of the Original Guaranties pursuant to 11 U.S.C. § 548, 11 U.S.C. §544 and/or N.C.G.S. §§ 39-23.1 *et seq.*

11.        Establish the extent and validity of the security interest of UDX in the assets of VIM.

12.        To the extent it is determined that UDX does not have a valid security interest in the assets of VIM, ordering UDX to terminate the Financing Statement by filing a notice of termination with the North Carolina Secretary of State.

13.        In the alternative, to avoid and set aside the VIM Transfer to UDX, as successor in interest to Harrington Bank, pursuant to 11 U.S.C. § 548, 11 U.S.C. §544 and/or N.C.G.S. § 39-23.1 *et seq.*, and preserve the VIM Transfer for the benefit of VIM's estate pursuant to 11 U.S.C. § 541.

14.        That the costs of this action be paid by the Defendants.

15.        Such further relief as the court may deem just and proper.

Respectfully submitted this the 5th day of December, 2014.

/s/ John A. Northen

**Counsel for the Plaintiffs:**
John A. Northen, NCSB #6789
jan@nbfirm.com
Vicki L. Parrott, NCSB #25449
vlp@nbfirm.com
John Paul H. Cournoyer, NCSB #42224
jpc@nbfirm.com
NORTHEN BLUE, L.L.P.
Post Office Box 2208
1414 Raleigh Rd., Ste 435 (27517)
Chapel Hill, NC 27515-2208
Telephone:  919-968-4441